UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-21919-CIV-HOEVELER

BISCAYNE TOWING & SALVAGE, INC.,
and TRIPLECHECK, INC. d/b/a SEA TOW MIAMI,

    Plaintiffs,
and

TOW TELL MARINE SERVICES, LLC d/b/a
H2O TOWING & SALVAGE; MARINE BID
EXCHANGE, INC., and CHARLES M.
STEPHENS, INC.; and SUNTRUST BANK,

    Intervening Plaintiffs,
vs.

RENZO RENZI and AMADA HOLDINGS, INC.,
in personam, and M/Y AMADA, U.S. Documentation
No. 1155137, its engines, boats, equipment, machinery,
furnishings, apparel and appurtenances, etc., in rem,

    Defendants.
_____/

## ORDER ON PENDING MOTIONS

This Cause comes before the Court on the following motions:

\* Motion to Compel Compliance with Local Admiralty Rule E(5)(b),
    filed by Biscayne Towing & Salvage, Inc.

\* Motion for Expedited Interlocutory Sale or to Change Substitute Custodian,
    filed by Tow Tell Marine Services, LLC, d/b/a H2O Towing & Salvage

\* Motion to Find Probable Cause and Set Appropriate Bond,
    filed by SunTrust Bank

The Court heard argument and received evidence from the parties at a hearing on April 15, 2009. At that time, the Court granted H2O Towing's request to file a

1

memorandum of law, and the Court has reviewed that memorandum as well as the response and reply thereto. For the reasons stated below, the Court has determined that bond shall be set in the amount of **$1,045,142.12**, an amount which adequately protects the legal interests of all intervening parties, as described below.

## BACKGROUND

This action for unpaid salvage services was filed on July 8, 2008, by Biscayne Towing and Triplecheck, Inc., d/b/a Sea Tow Miami, against the M/Y Amada, a 115 foot vessel owned by Renzo Renzi.[1] Salvage services allegedly were rendered by Plaintiffs to the vessel on April 12, 2008, while the M/Y Amada was docked at the Miamarina. The amount of Plaintiffs' claim at the time of filing this action was $85,800.00 plus interest, and Plaintiffs included with their Complaint a copy of the Standard Uniform Yacht Salvage Contract which appears to be signed by the Captain of the M/Y Amada.

It is undisputed that this Court has jurisdiction over the vessel and the claims asserted in this action. After a review of the verified claims in Plaintiffs' Complaint, the Court issued a warrant of arrest and on Aug. 5, 2008, the vessel was turned over to Biscayne Towing as the substitute custodian. Dkt. No. 11.

The following plaintiffs subsequently have intervened, each alleging to have claims against the vessel: Tow Tell Marine Services, LLC d/b/a H2O Towing & Salvage (claim for salvage pumping and other services related to an event on June 25, 2008,

---

[1] Plaintiffs allege that Defendant Amada Holdings, Inc., had "represented itself to be the owner of the M/Y Amada." Complaint, ¶4. The Court does not address the question of ownership at this time, as it is unnecessary to resolve that question in order to rule on the pending motions.

2

total demand $636,875.00 when intervening complaint was filed); Marine Bid Exchange, Inc., and Charles M. Stephens, Inc. (claim for internet-based auctioneer and repair-bidding services rendered in March and April 2006, total claim of $47,500.00); and SunTrust Bank (holder of the loan on the vessel, total demand at time of intervening complaint was $883,945.03). Renzo Renzi filed a claim on August 14, 2008, and answered the case on August 18, arguing, *inter alia*, that the vessel did not need salvaging on June 25, 2008, and that the claim filed by H2O Towing was excessive. The Court held an evidentiary hearing to address the challenged validity of the claim by H2O Towing in order to be able to set an appropriate bond. Although the hearing was not a trial, and this Order does not conclusively establish a salvage award amount– but rather only sets the amount of bond required to obtain release of the vessel, it nevertheless should provide guidance to the parties as to the relative strength or weakness of the evidence presently before the Court.

## FACTS

To establish an appropriate amount for the bond in this matter is a rather simple question as to the Plaintiffs and the Intervening Plaintiffs other than H2O Towing. The question before the Court is what amount, if any, to include in the bond to secure the interest of H2O Towing related to their claim for salvage and other services allegedly rendered to the M/Y Amada from June 25, 2008, to August 5, 2008, when the vessel was arrested.

The following facts related to the claim by H2O Towing are undisputed. The M/Y Amada was docked at Miamarina and was taking on water in the early morning hours of

June 25, 2008. There was some amount of water in the aft engine room, although the exact amount is disputed. The Marina Manager at Miamarina, Juan Ginarte, contacted John Tellam of H2O Towing[2] to provide pumping service to the vessel and then directed H2O Towing to remove the vessel from the marina. Approximately six weeks earlier, the vessel had experienced a similar problem at the Miamarina (i.e., taking on water while docked at the marina); services were rendered at that time by Biscayne Towing and Sea Tow Miami, and the unpaid balance due for those services is the subject of Plaintiffs' initial Complaint in this action.

As to every other pertinent detail, the parties disagree. For example, as part of the services allegedly rendered to the M/Y Amada, H2O Towing claims to have patched a two-inch hole in the exhaust manifold. Intervening Complaint, ¶ 8f, Transcript of Deposition Testimony of John Tellam (Tellam Tr.), pp. 57, 59-60, 66, 68, 102, 107, but no evidence of a patch has been presented to the Court. However, an expert witness (whose credentials were not challenged by H2O Towing) claims to have performed a "careful inspection" and found no evidence of any patch or temporary repair at the source of the leak described by Tellam. Affidavit of Stewart Hutcheson (Hutcheson Affid.), ¶3. Further, Hutcheson declared that the source of the water was not the exhaust manifold described by Tellam, but rather the raw water discharge on the

---

[2] John Tellam testified at deposition that H2O Towing is owned by his father, Henry Stevens Tellam, and brother, Jeffrey Edward Tellam. Tellam Tr., p. 4. Previously John Tellam worked under a different business name, Sea Tow Key Biscayne, until Sea Tow changed from license agreements to a franchise agreement and John Tellam left Sea Tow. Tellam Tr., p. 10. There is no evidence that Plaintiff Triplecheck, Inc., d/b/a Sea Tow Miami is related to the Tellams.

4

starboard side of the engine room. Hutcheson Affid., Dkt. No. 67, ¶2.b. Hutcheson appeared before this Court and none of the parties credibly challenged the veracity of his statements. Although John Tellam, of H2O Towing & Salvage, was not offered as a witness before the Court, Tellam did verify that the Intervening Complaint filed on his company's behalf was "true and correct to the best of my own personal knowledge and information." At trial, the Court will be able to assess Tellam's credibility.

The Court has evaluated the claims as to the services allegedly rendered by H2O Towing and makes the following findings of fact for the purposes of setting bond. Again, this is based on the record before the Court at present, a record which may be amplified at trial.

According to the Marina Manager, shortly after discovering just before 7:00 a.m. that the M/Y Amada was sitting low in the water while dockside, he directed his staff to contact Renzi – but they were not successful. Ginarte Tr., p. 24 (p. 24 of Dkt. No. 62).[3] Ginarte immediately contacted Sea Tow,[4] and reports that he was told to "let the boat sink" because of an unpaid balance owed by Renzi. Id. Ginarte then contacted John Tellam of H2O Towing, and told him that the M/Y Amada was "going down .... [i]t's

---

[3]Renzi claims that his phone was charging and that he received the call from Ginarte at approximately 8:00 a.m., Renzi Tr., p. 59, at which time Ginarte told him that the boat was already on its way out of the marina, id.

[4]At the hearing on April 15, 2009, Harry C. Offutt of Biscayne Towing testified to the Court that Biscayne Towing was never notified of the incident on June 25, 2008, but did hear on the marine radio when Renzi was communicating with Tellam as the boat was being towed. Offutt said that Biscayne Towing easily could have provided the necessary services, and noted that they had joint ventured with Sea Tow as to the earlier event. Offutt did not know whether Sea Tow had been contacted by Ginarte.

about a half hour before it goes down." Ginarte Tr., p. 26. Tellam arrived by boat at the marina shortly thereafter.

The source of the water intrusion is somewhat unclear,[5] although it is undisputed that Ginarte and Tellam discovered some water in the engine room. There was some water under the floorboards of the engine room, and some above. Tellam Tr., p. 42. The water level in the engine room was deeper at the rear of the boat, of course, because of the boat's position in the water (stern was lower than bow ).

Tellam began the process of pumping the water out of the boat and claims that the "dewatering" of the vessel lasted approximately two hours, using two three-inch high volume dewatering pumps, Intervening Complaint, ¶ 8e, j; Tellam Tr., pp. 33, 83; see also, Ginarte Tr., p. 35 (Tellam spent "about two-and-a-half hours pumping" water from the M/Y Amada while at Miamarina). In direct contrast, however, Stewart Hutcheson testified that two hours of pumping using that type of pump would suggest that a significantly greater amount of water was present than is seen in photographs taken at the marina to document the extent of the water intrusion in the engine room. Indeed, Hutcheson testified that the amount of water which would have required two hours to pump out using two of those pumps would have sunk the vessel – i.e., the

---

[5]Although the precise source of the leak is somewhat irrelevant to the question before the Court related to setting a bond, it is interesting to note an "explanation" offered by Renzi as to the cause of at least some of the water intrusion. Renzi, who had been aboard the M/Y Amada the prior evening, stated that the source of the water was one of his assistants who had left the water running in a hose filling the potable water tank. Renzi Tr., pp. 50-52. Renzi claimed that Ginarte knew about the running water and admitted to Renzi that Ginarte also forgot to turn the water off. Renzi Tr., pp. 53, 62. According to Renzi, Ginarte turned off the water to the hose at 7:00 a.m. on June 25, 2008. Renzi Tr., p. 99. These statements are not admitted by Ginarte.

vessel would have been submerged by the approximately 60,000 gallons of water that would have been pumped out by two pumps operating for two hours.

In addition to pumping out the water, Tellam allegedly examined the M/Y Amada to determine the source of the leak. Tellam reports that the water was coming into the vessel through a two-inch hole in the exhaust manifold. Intervening Complaint, ¶ 8f, Tellam Tr. p. 57, 59-60, 66, 68, 102, 107, and that he shoved a towel into the hole while at the marina, p. 59. Ginarte, however, stated that Tellam had not plugged or patched the leak near the exhaust, which was causing water to stream through to the engine room, at any time prior to removing the vessel from the marina. Ginarte Tr., pp. 54-55, 106. Tellam asserts that he patched the hole later when the vessel was at the barge, p. 144, and that he "didn't think of" patching the hole with epoxy while at the marina, p. 118.

Because of the continuing potential for water intrusion, Ginarte told Tellam to remove the vessel from the Miamarina. Ginarte Tr., pp. 37- 38, 54; Tellam Tr., pp. 197 - 199, 212. According to Ginarte, this decision was based on the fact that the leak wasn't repaired. Ginarte Tr., pp. 54, 106. H2O Towing removed the vessel from the marina, towed it to a location in Biscayne Bay near H2O Towing's base of operations,[6] a barge, and posted watchmen on the vessel.

According to the Intervening Complaint filed by H2O Towing, the Lil Mo Salvage Company was contacted to secure the vessel, and provided a landing craft at the

---

[6]Renzi claims to have spoken by marine radio to the person towing the M/Y Amada at approximately 9:30 a.m. while the M/Y Amada was being towed from the Miamarina, Renzi Tr., p. 61.

7

location in Biscayne Bay, which then was secured alongside the M/Y Amada. Thus, the M/Y Amada was secured between the H2O Towing barge on one side and the landing craft on the other side. The landing craft is a 115 foot vessel equipped for salvage assistance. Declaration of Wayne Bauer, Plaintiff's Exh. 3 (also in Dkt. No. 62). The bill for use of the landing craft originally was $400/hr, Tellam Tr., p. 150, and then reduced by 50%, to a final total of $192,000, Tellam Tr., p. 162.

According to Tellam, it was necessary to have two members of the landing craft serve as security around-the-clock, at a cost of $1,200/day, Tellam Tr., p. 160; this continued for 40 days, for a total cost of $48,000 billed by Lil Mo, Dkt. No. 25 (revised Salvage Assistance Invoice from Lil Mo Services and Salvage). It is unclear whether Lil Mo or H2O Towing were the provider of the following services included in the outstanding Invoice on which H2O Towing is proceeding: $625 for divers to inspect the vessel bottom; $8,000 for the use of 2 generators for 40 days; and fuel and oil costs. The total for the claim on behalf of Lil Mo is $269,875 (of which $192,000 is for the use of the landing craft), Dkt. No. 25, which is a significant reduction from the originally claimed $461,875, Dkt. No. 62 (Declaration of Wayne Bauer).

## ANALYSIS

As an initial matter, the Court addresses SunTrust's Motion to Find Probable Cause and Set Appropriate Bond for Release of the Vessel. SunTrust's motion relies on the Promissory Note and First Preferred Ship Mortgage on the M/Y Amada executed by Renzi on March 23, 2004, in the amount of $1,000,000.00. Additional costs, not including attorney's fees, result in a total indebtedness of $896,842.12, with interest at

6% per year accruing as of March 4, 2009. (SunTrust is entitled to attorney's fees, but the Court will address the amount of fees at a later date.) Based on the reasons stated in that Motion, specifically Renzi's failure to make required periodic payments, failure to maintain insurance on the boat, and failure to obtain the timely release of the vessel after arrest, the Court GRANTS SunTrust's Motion. Thus, a bond should be set, at a minimum, in the amount of **$896,842.12**.

In addition, the claims of Plaintiffs Biscayne Towing and Sea Tow, collectively, essentially are undisputed by Defendants. Thus, an additional amount of **$85,800.00** will be included in the bond amount. The amount of this claim as stated for the purpose of setting a bond does not limit Biscayne Towing, as substitute custodian, from seeking additional amounts. For example, Biscayne Towing is entitled to at least the custodial costs as of August 5, 2008, at the amount of $330/day, or approximately $95,400.00 custodial costs as of the date of this Order. (Additional costs which may have been incurred by Biscayne Towing as substitute custodian include costs for towing or other services or supplies for the M/Y Amada.) Biscayne Towing's Motion to Compel Compliance with the admiralty rules is DENIED. Any custodial costs incurred by Biscayne Towing are secured because of their priority as a lienholder, as stated below.

At a hearing before the Court on January 28, 2009, counsel for Renzi argued that the claims of Marine Bid Exchange and Charles M. Stephens, in the amount of $47,500.00, were excessive in relation to the internet-based bidding services provided. On December 8, 2008, this Court had granted the motion to intervene, filed by Marine Bid Exchange and Charles M. Stephens, but there is no record that service was

9

perfected on Defendants. Although Renzi apparently challenges that claim, he has not yet offered evidence to support his position. The Court will recognize the claim solely for the purposes of setting bond at this stage, and Renzi will be permitted to challenge the validity, and amount, of this claim at trial. Thus, an amount of **$47,500.00** shall be included in the bond to preserve the potential interest of Marine Bid Exchange and Charles M. Stephens.

Finally, the Court turns to the question of the salvage claim presented by H2O Towing. H2O Towing initially claimed a total of $636,875, which included $461,875 for Lil Mo Salvage expenses. The invoice amount from Lil Mo later was reduced voluntarily to $269,875 (a reduction of $192,000, or 50% of the charge related to use of the Lil Mo landing craft). As to its own claim, H2O Towing seeks $175,000.00 for "services performed on June 25, 2008, and thereafter to maintain the integrity of the vessel and prevent her from sinking again, pumps used and stand by pumps on hand, vessels and equipment used and vessels and equipment on hand, bags, 100' spill boom, and dockage at H2O facility." Intervening Complaint, ¶10.

The Court finds that the claim presented by H2O Towing is subject to reduction – at least for the purposes of setting a bond to secure that claim – for a number of reasons. Hutcheson testified that the removal of the M/Y Amada from Miamarina was "absolutely unwarranted" and that any prudent salvor simply would have made the vessel seatight rather than towing the vessel and engaging in the work purportedly performed by H2O Towing. This Court agrees, and observes that peril is a necessary element for a salvage claim. <u>Klein v. Unidentified Wreck & Abandoned Sailing Vessel</u>,

758 F.2d 1511 (11th Cir. 1985). H2O Towing has not established that the M/Y Amada was at peril after the initial services were rendered at Miamarina, i.e., after the excess water was pumped out of the engine room. Thus, any part of the claim accruing after the M/Y Amada's departure from Miamarina is not governed by the principles of salvage.

Tellam himself admits that prior to departing from Miamarina with the M/Y Amada, "as far as any other water coming into the boat, it appeared it had been stabilized." Tellam Tr. p. 88. Tellam claimed, however, that the boat was in danger of sinking at the marina even after the source of the water intrusion had been identified and plugged, because the vessel "had no power ... [to operate the] bilge pumps," and had "no batteries," Tellam Tr., p. 76, but Tellam admits that he never tested the batteries to see if they had power or would hold a charge, Tellam Tr., p. 89. Moreover, and as further indication of the excessiveness of the claim presented by H2O Towing, the Court notes that new batteries allegedly installed by H2O Towing, and billed to the owner, were not found on board when the vessel was placed with the substitute custodian. Hutcheson Affid. ¶9.d. Tellam had testified that "the batteries were definitely installed .... [w]hen it left the [H2O] barge, it had new batteries in it." Tellam Tr., pp. 157-58. It thus appears that the original batteries – which Tellam had claimed were not functioning – remained sufficient to the vessel's needs.

Tellam claims that he only removed the vessel from the marina because he was directed to do so by Ginarte, Tellam Tr., pp. 92-93, but Ginarte asserts that his decision to have the vessel removed was based on the fact that the leak wasn't repaired,

11

Ginarte Tr., pp. 54, 106.  Thus, Tellam created the situation – or at least allowed Ginarte to believe such a situation existed – that compelled Ginarte's decision to have the vessel removed.  While peril is a necessary element for a valid salvage claim, peril which is created by the purported salvor's own actions cannot support entitlement to a claim.

Moreover, it appears that there was miscommunication, or perhaps deliberately misleading communication, regarding transfer of the M/Y Amada from the Miamarina to the Merrill Stevens boatyard.  According to deposition testimony of Marina Manager Ginarte, and a memo he prepared shortly after the incident, at approximately 10:30 a.m., the vessel departed and "Captain Tellam indicated that he was taking the vessel to Merrill Stevens Boatyard."  Plaintiff's Composite Exhibit 5, City of Miami Inter-Office Memorandum from Juan Ginarte to Laura Billberry, Dir., Department of Public Facilities, dated July 2, 2008 (also in Dkt. No. 62); Ginarte Tr., p. 85.  When Renzi called Ginarte at 10:55 a.m., Ginarte told Renzi that the vessel was being taken to Merrill Stevens Boatyard.  Ginarte Tr., p. 86.  (Although there was a question as to whether the M/Y Amada's dockage rental fees at Miamarina were current, Ginarte reported that the security deposit paid by Renzi had been used to cover unpaid dockage fees.  Ginarte Tr., p. 95.)  Tellam admits, but then denies, that when he met Renzi soon after the boat was secured to the H2O Towing barge that Renzi directed that the boat be taken to a boatyard, either "Merrill Stevens or Jones."  Tellam Tr. p. 109, 130.  Tellam also claims that Renzi said that the insurance information at the Miamarina had been falsified and that the vessel was not insured.

12

Tellam said that he "probably" would not have agreed to take the boat to Merrill Stevens boatyard unless Renzi paid him or promised to pay for the services rendered, p. 120, because Tellam had learned that Renzi had not paid for "salvage for [the boat] sinking" on a prior occasion, p. 123.[7] However, Ginarte said that he did not tell Tellam the reason that Sea Tow had declined the request for assistance. "I did not get into the details with [Tellam] why, you know. I can't release that information to him." Ginarte Tr., p. 26. Tellam also claimed that he did not surrender the M/Y Amada because Renzi "would have taken the boat out of the country." Tellam Tr., p. 166. Finally, at a hearing before the Court on Jan. 28, 2009, counsel for H2O Towing claimed that the M/Y Amada couldn't be taken to Merrill Stevens or any where else because it was uninsured. Thus, H2O Towing offers several reasons for having retained custody of the M/Y Amada, none of which this Court finds credible - particularly in light of the excessive claim being demanded by H2O Towing in exchange for release of the vessel.

According to Tellam, he based his initial estimate of the cost for his services on 10 to 15 percent of the boat's value, Tellam Tr., p. 111, which Renzi had estimated at two million dollars, id. That is, Tellam demanded approximately $200,000 - $300,000 for the services rendered that morning. Renzi offered to pay $10,000, and Tellam refused. Tellam Tr., p. 134. Interestingly, no bill was ever presented by Tellam to Renzi prior to the filing of the Intervening Complaint in this action. Tellam Tr., p. 136. The Court also finds it interesting that Renzi claims that personal property was

---

[7]Tellam subsequently revised his statement to indicate that the M/Y Amada had not sunk before, but had almost sank, and "came close" to sinking, Tellam Tr., pp. 217-18.

13

removed from the M/Y Amada, totalling $122,000, Dkt. No. 57, and Renzi testified before this Court on April 15, 2009, that he saw Tellam wearing Renzi's sandals which had been on the M/Y Amada.

Apart from the $269,875.00 claimed by H2O Towing for services rendered by Lil MO (including the use of the landing craft, divers, generators, personnel to serve as watchmen, and fuel and oil costs), H2O Towing's claim for dockage and other fees (including the pumping out of water from the M/Y Amada while at the Miamarina) to maintain the vessel is $175,000. The Court weighs this claim in light of other charges for dockage, towing and general maritime services.

As current custodian of the vessel, Offutt of Biscayne Towing stated that only normal procedures have been required to keep the boat afloat, e.g., a small electric pump on board. Indeed, Offutt testified that he saw no evidence of where the water allegedly entered the engine room. Biscayne Towing, as substitute custodian, is charging $1.00 per foot per day, or $330/day for storage of the vessel. H2O retained custody of the vessel for approximately 40 days. Hutcheson declared that typical in water storage charges would be $1.50 per foot per day, or approximately $6,000 for 40 days. Hutcheson Affid., ¶9.b.

Tellam stated that he would charge $300 to $400 per hour for each of the two boats that would be required to tow a vessel the size of the M/Y Amada, Tellam Tr., p. 216, i.e., $600 to $800 an hour for towing. Tellam also stated that the cost charged by Vessel Assist to assist in towing the vessel from the Miamarina to the barge in Biscayne Bay was $3,000.00. Tellam Tr. p. 96. Assuming that these figures for towing

14

total approximately $4,000.00 (towing apparently lasted less than one hour), that equals approximately $10,000.00 for the 40 days of dockage and the towing charges.

There is scant evidence in the record as to what would be an appropriate charge for the approximately 2.5 hours of pumping while at the marina, but it appears that H2O Towing is charging more than $165,000.00 for this service ($175,000.00 total claim, minus the $10,000.00 noted above as reasonable charges for towing and dockage). This claim is excessive, particularly because Tellam acknowledged that there was no additional risk, beyond usual risks of operating boats, posed as a result of this salvage operation. Tellam Tr., pp. 186-188.

While the law is clear that salvage awards are not based on quantum meruit, but rather serve as a "bounty historically given in the interests of public policy," Ocean Services Towing & Salvage, Inc. v. Brown, 810 F. Supp. 1258, 1262 (S.D. Fla. 1993), that principle derives from the desire "to encourage the humanitarian rescue of life and property at sea, and to promote maritime commerce." Id. The record, at least as presently developed, is clear that the pumping services provided by H2O Towing to the M/Y Amada while docked at Miamarina addressed the needs of a vessel experiencing only minimal peril. The purported salvor's failure to patch the alleged source of the water intrusion – and admission that the situation had been stabilized before departing from the marina – support the conclusion that whatever minimal peril existed at 7:00 a.m. was completely eliminated by 9:30 or 10:00 a.m. that morning. Despite the vessel owner's attempt to regain control of the vessel shortly thereafter and to have it transported to a repair facility/boatyard, H2O Towing demanded a full salvage award of

$200,000.00 or more. This amount represents an excessive claim, one which the Court need not protect by setting a bond to include that amount. The Court has determined that a bond in the amount of $15,000.00 ($10,000.00 for towing and dockage, and $5,000.00 for pumping services) adequately protects any valid claim which may be established at trial by H2O Towing and Lil Mo, collectively. Thus, the bond shall include an amount of **$15,000.00** for the claim of H2O Towing (including no allowance for the claim it raised on behalf of Lil Mo – as those services resulted solely because of the unwarranted removal of the M/Y Amada from the marina). To be clear, this determination is made solely in the context of setting an adequate bond in this action; at trial, all parties will be able to attempt to establish or discredit any of the claims addressed above. Further, the Motion to Strike Affidavit of Renzo Renzi, filed by Tow Tell Marine Services, LLC, is DENIED.

## CONCLUSION

As noted above, Renzi has not yet challenged the validity of the claim filed by Plaintiffs Biscayne Towing & Salvage, Inc., and Sea Tow Miami. The Court notes that arbitration of that claim may be appropriate, although Renzi has objected to the arbitration clause in Biscayne Towing's contract. Biscayne Towing has suggested that the aribitrator can make the initial determination as to whether the contract's arbitration provision is valid, and the Court encourages all of the parties to work cooperatively to address the question of arbitration or mediation of this dispute.

The Motion for Expedited Interlocutory Sale or to Change Substitute Custodian, filed by Tow Tell Marine Services, LLC, d/b/a H2O Towing & Salvage, is DENIED. The

$200,000.00 or more. This amount represents an excessive claim, one which the Court need not protect by setting a bond to include that amount. The Court has determined that a bond in the amount of $15,000.00 ($10,000.00 for towing and dockage, and $5,000.00 for pumping services) adequately protects any valid claim which may be established at trial by H2O Towing and Lil Mo, collectively. Thus, the bond shall include an amount of **$15,000.00** for the claim of H2O Towing (including no allowance for the claim it raised on behalf of Lil Mo – as those services resulted solely because of the unwarranted removal of the M/Y Amada from the marina). To be clear, this determination is made solely in the context of setting an adequate bond in this action; at trial, all parties will be able to attempt to establish or discredit any of the claims addressed above. Further, the Motion to Strike Affidavit of Renzo Renzi, filed by Tow Tell Marine Services, LLC, is DENIED.

## CONCLUSION

As noted above, Renzi has not yet challenged the validity of the claim filed by Plaintiffs Biscayne Towing & Salvage, Inc., and Sea Tow Miami. The Court notes that arbitration of that claim may be appropriate, although Renzi has objected to the arbitration clause in Biscayne Towing's contract. Biscayne Towing has suggested that the aribitrator can make the initial determination as to whether the contract's arbitration provision is valid, and the Court encourages all of the parties to work cooperatively to address the question of arbitration or mediation of this dispute.

The Motion for Expedited Interlocutory Sale or to Change Substitute Custodian, filed by Tow Tell Marine Services, LLC, d/b/a H2O Towing & Salvage, is DENIED. The

Court notes that Biscayne Towing no longer opposes the expedited sale of the vessel, and argues that the approach of hurricane season presents concerns as to the M/Y Amada, which apparently is uninsured. In the event that bond is not posted within the next thirty (30) days, the Court will entertain a renewed motion for interlocutory sale of the vessel. Bond is set in the amount of **$1,045,142.12**, which includes the following amounts:

| | |
|---|---|
| SunTrust Bank: | $896,842.12 |
| Biscayne Towing and Sea Tow: | $85,800.00 |
| Marine Bid Exchange, Charles M. Stephens: | $47,500.00 |
| Tow Tell Marine Services d/b/a H2O Towing: | $15,000.00. |

In addition to the bond, all fees of the United States Marshal and the substitute custodian must be satisfied before the M/Y Amada may be released. The bond amount does not include interest to which the Plaintiffs and Intervening Plaintiffs may be entitled; such sums may be added to the bond total upon submission of supported requests by the parties.

Finally, the Motion to Withdraw, filed by counsel for Renzi, apparently has been withdrawn – based on counsel's representations at the hearing – and therefore is DENIED, as moot.

DONE AND ORDERED in Chambers at Miami, Florida this 22d day of May, 2009.

/s/ Wm M Hoeveler
WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE

Copies to:
 counsel of record